KEVIN V. RYAN (CSBN 118321)
United States Attorney

MARK L. KROTOSKI (CSBN 138549)
Chief, Criminal Division

STEPHEN H. JIGGER (CSBN 219430)
BARBARA BRENNAN SILANO (MASSBAR 055540)
Assistant United States Attorneys

450 Golden Gate Avenue
San Francisco, Ca. 94102
Tel: (415) 436-7223/6831
Steve.Jigger@usdoj.gov
Barbara.Silano@usdoj.gov

Attorneys for Plaintiff

E-Filing

FILED
JUL 1 2 2006
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA, ) No. CR-06-0316 MHP
)
  Plaintiff, )
) ORDER OF DETENTION
  v. )
)
KASI TALEA POHAHAU, )
)
  Defendant, )
)

I. **INTRODUCTION**

A detention hearing in the above captioned case for defendant Kasi Pohahau was conducted on June 20. 2006. The Court has carefully considered the government's motion, with the attached affidavit of Special Agent John Illia and series of arrest reports detailing the defendant's criminal history, the pre-trial services report and recommendation and the arguments of both parties. The Court finds that the defendant poses a risk of flight, but that there are conditions, or combinations of conditions which could be fashioned in order to assure the appearance of the defendant for trial. However, the Court finds that the defendant poses a serious danger, and that there are no conditions,

DETENTION ORDER          1

or combination of conditions which will assure the safety of the community if he is released. Therefore, for the reasons set forth herein, the Court Orders that the defendant be detained.

## II. FACTORS TO CONSIDER UNDER 18 U.S.C. § 3142

### 1. Charges and Rebuttable Presumption

On May 2, 2006, the Grand Jury for the Northern District of California returned an indictment charging defendant Kasi Pohahau and eighteen others with conspiracy to distribute methamphetamine and cocaine in violation of Title 21 U.S.C. § 846. The indictment also charges POHAHAU with two substantive counts of distribution of methamphetamine and one substantive count of distribution of cocaine in violation of Title 21 U.S.C. § 841(a)(1). The conspiracy count and two of the substantive counts carry a minimum mandatory sentence of ten years to life in prison. Therefore, there is a rebuttable presumption that he is both a flight risk and a danger. See 18 U.S.C. §3142 (e).

### 2. Defendant's Violent Nature and Criminal History

The details surrounding defendant Pohahau's frequent contacts with law enforcement leave this Court convinced that he is a danger. During the course of this investigation, two co-operating witnesses (CW-7 and CW-8) attempted to introduce an undercover agent to POHAHAU. Posing as individuals involved in the drug trade, the two co-operating witnesses were in a unique position to witness the methods utilized by POHAHAU to distribute drugs. According to the affidavit of Special Agent John Illia submitted in support of a wiretap on defendant Pohahau's telephone, as plans were underway for POHAHAU to meet with the two co-operators, a third individual working with law enforcement informed the Special Agents of the FBI that instead of engaging in a drug deal with the co-operators as expected, POHAHAU had expressed an interest in killing CW-7 and CW-8 and stealing the drugs. The utilization of CW-7 and CW-8 was terminated due to concerns for their physical safety.

The Court is concerned that the proffered plans to rob and kill CW-7 and CW-8 are not isolated incidents. Rather, they are part of a history of threats, violence, and

DETENTION ORDER 2

intimidation by POHAHAU. The court notes that over twenty separate individuals provided information to the FBI regarding Pohahau but that they had uniformly and repeatedly expressed a concern for their safety and the safety of their families if their identities were revealed. In 1993, CI-1 received threats from POHAHAU due to CI-1's cooperation with law enforcement. CI-3 further advised that "the POHAHAU organization was also involved in "rips" (the armed robbery of drugs, money, or both from other criminals). CI-3 went on to explain that POHAHAU distributed drugs to the Tongan Crips in East Palo Alto. CI-10 stated specifically that POHAHAU and his family members would kill CI-10 and CI-10's family.

CW-4 provided information regarding a meeting in which POHAHAU planned to "rip" pseudoephedrine pills from a supplier. According to CW-4, POHAHAU asked two individuals present if they had "heat" which CW-4 understood to mean guns. POHAHAU said he would take care of it and asked the individual what kind of gun he wanted. CW-10 refused to acquire narcotics directly from POHAHAU as POHAHAU had the reputation of being harsh with anyone who could not pay their drug debts and also had a reputation for having people shot or beat up. CI-10 has personally witnessed POHAHAU beat, threaten and intimidate others.

Moreover, this Court finds that the danger posed by Pohahau is a characteristic with some history. According to the details of his arrest reports provided by the government, POHAHAU's first violent criminal act occurred when he was only eleven years old. On March 14, 1983, a fistfight broke out in the school yard at Garfield school in Redwood City. A teacher grabbed POHAHAU and tried to pull him away. POHAHAU picked up the end of a heavy chain and tried to hit the teacher with it. Two days later, he was arrested by San Mateo County Sheriffs for the assault on the teacher. He was given his Miranda warnings and stated "Fuck you, man." As a result he was made a ward of the county and put on probation.

On March 6, 1984, while still twelve years old, defendant POHAHAU and his brother Sesi were arrested by Redwood City Police Department for assault. The incident

DETENTION ORDER 3

report reflects that POHAHAU and his brother struck and kicked a fifteen year old victim while the victim was waiting at a bus stop. He was booked into Hillcrest Youth Detention Facility and his mother notified.

On October 31, 1984, when POHAHAU had just turned thirteen, a student at the Physical Education class came running to his teacher for help as POHAHAU, his brother, and a third young man approached. During the fight which followed, the child victim was punched in the head and body and hit with a baseball bat. The teacher was also assaulted.

At age fourteen, POHAHAU was stopped for loitering. POHAHAU began to shout and swear at the officers and told them to "Fuck off" and "Get the Fuck away". He then called one of the officers a "mother-fucker" and a "cock-sucker." At one point, POHAHAU refused to take his hands out of his pockets requiring one of the officers to draw his weapon. POHAHAU took out his hands and got in a fighting position. He came at the officers and during the struggle, one officer was injured and treated at the hospital for a bruised rib and a sprained wrist. POHAHAU was cited for juvenile detention and, again, released to his mother.

On February 14, 1988, POHAHAU saw a relative of a person with whom POHAHAU had fought months earlier. POHAHAU approached him and said "You think I am afraid of you, I'm going to kick for fucking ass". POHAHAU proceeded to punch the victim in the neck. The victim fell down and pulled a gun pout of his waistband. As POHAHAU tried to flee, POHAHAU fell, and was shot in the elbow and mid-section requiring surgery. All charges were later dropped because the witnesses could not be located.

According to East Palo Alto police department records, in November of 1989, POHAHAU pulled up to a house and said to an individual "Do you want to fight?" As POHAHAU walked up to the victim, POHAHAU removed a gun from his waistband. The victim hit POHAHAU in the hand and tried to run away. POHAHAU shot at the victim. When the police arrived, they recovered a shell casing from the driveway. While two witnesses confirmed the details of the brandishing and assault of the weapon for the

DETENTION ORDER 4

police, neither witness came forward at the time of prosecution.

In March of 1990, the police went to POHAHAU's home on Fifth Avenue in Redwood City to speak to POHAHAU's brother. When they advised POHAHAU's brother that he was to be placed under arrest, the brother's response was "Fuck that" and the brother walked back into the house. The police followed him into the home to attempt to restrain the brother and the brother called for POHAHAU. POHAHAU came into the room and began to fight with the officers. POHAHAU's brother fled and one officer attempted to follow the brother. POHAHAU blocked the officer from following. POHAHAU's father then came into the room and began to assault the officer with a two-by- four.

On April 1, 1990, POHAHAU was stopped while driving a car, identified himself as SETA POHAHAU, and claimed to have no license. Later he admitted giving false information and was cited for providing false information to a police officer.

On Christmas Day in 1990, the family went to see the Godfather movie. POHAHAU's niece went to the restroom and when she returned, POHAHAU asked the man in front of him to move so that his niece could sit down. The man did not move and POHAHAU punched him. The victim ran outside. POHAHAU was detained in the theater by police and said "If they fight with her, I'm going to kick your ass and that stick and uniform don't scare me. I'll still beat you." POHAHAU was convicted of misdemeanor battery, and sentenced to twelve months probation, and 10 days in jail.

Less than twelve months later, on August 23, 1991, at age nineteen, four San Mateo County Sheriff's Deputies responded to the scene of another assault when POHAHAU walked up, walked past all four deputies and punched the victim causing him to move six to eight feet. POHAHAU made the spontaneous statement "I don't care if I go to jail, it was worth it." The reason that POHAHAU beat the victim was because he thought, mistakenly, that the victim had fought with his nephew. He was arrested for assault and battery and later convicted of misdemeanor battery.

On August 9, 1992, POHAHAU and three friends were on Main Street in

DETENTION ORDER 5

Redwood City. An officer saw a man hand a gun to POHAHAU. POHAHAU took the gun and ran around the corner to try to hide it in a planter box. POHAHAU was arrested and officers seized a fully loaded 9mm that was in the firing position with a round in the chamber. The case was later dismissed.

On October 21, 1993, an eight year old boy brandished in a crowd what appeared to be a gun. The crowd later determined that the gun was a toy. As a result, the crowd taunted the eight year old. He responded that he would go get his family. One hour later, POHAHAU and his brother and a third individual showed up. They assaulted two people in the crowd. When they were driving away, a long barrel firearm was brandished out of the window of the vehicle at the crowd. The victim and five witnesses all stated that they would not cooperate with the investigation any further out of fear of retaliation from the POHAHAU family. When the police arrived to interview POHAHAU and his brother, the suspects admitted to confronting the victim because he "fucked with their family."

On April 2, 1997, a BNE agent was on an unrelated surveillance and parked near 411 5th Avenue, Redwood City, California, the POHAHAU family home, and one of the properties proposed for bail. The plain clothes officer had his radio in his lap. POHAHAU came out of the house, and told him to "get the fuck out of there." The BNE agent identified himself as a law enforcement officer. POHAHAU told him "I don't give a fuck, we got guns too." POHAHAU then pulled out a gun from his waistband, and motioned with the weapon for the agent to move along. The agent drove around the corner and met with two deputies. Shortly thereafter, a vehicle departed 411 5th Avenue with POHAHAU and two others inside. The vehicle pursued the BNE agent's car and POHAHAU motioned downward indicating that he had a weapon. When finally arrested, POHAHAU issued racial epithets and slurs to the African American BNE officer. The case was later dismissed.

On March 7, 1994, POHAHAU arranged to have two people transport six kilograms of cocaine for him to St. Louis, Missouri. A traffic stop was conducted in Oklahoma and the drugs were discovered. One of the people cooperated and confirmed

DETENTION ORDER 6

that POHAHAU was the one that arranged the transportation. POHAHAU pleaded guilty to a conspiracy to distribute marijuana and was sentenced fifteen months in prison and three years of supervised release.

The fifteen months in prison apparently did little to rehabilitate or deter POHAHAU. On a Friday night in October1998, POHAHAU drove into the VFW bar parking lot in Redwood City, CA. He got out of a Mercedes with two friends, and immediately walked over to a Hispanic male and hit him over the head with a bottle. The victim sustained cuts over his head and face and was covered with blood. A fight ensued between more Hispanic males and POHAHAU's friends and shots were fired. A restraining order was issued as a result of the incident.

The Court is mindful of the arguments of Pohahau's counsel that these reports are merely written records of the incidents and not subject to cross-examination and this Court is also mindful that some of these incidents did not result in convictions. Yet the Court discerns a disturbing pattern of behavior from Pohahau's history and that pattern is one of violence.

The Court is also concerned that on May 3, 2006, Special Agents of the FBI executed a search warrant at the residence of POHAHAU, who is a felon. They recovered a loaded Glock ammunition magazine. Agents also recovered a total of $33,816.00 in cash.

### 3. Nature of the Offense

On July 15, 2005, and again on September 1, 2005, United States District Judge Martin J. Jenkins signed orders authorizing the interception of cellular telephone number (510) 750-7372 which was used by co-defendant Damasen to facilitate his illegal activities. Conversations intercepted on the wiretap demonstrated that Damasen was involved in the distribution of methamphetamine and cocaine in the San Francisco Bay Area and elsewhere.

Through use of the wiretap, agents learned that Damasen planned to supply two co-defendants with cocaine and methamphetamine. Agents observed the meetings and

DETENTION ORDER 7

then seized 494.4 grams of cocaine from one and one half of a pound of crystal methamphetamine from the other. Agents also determined that Rafael Ramirez and Anthony Quintana were drug sources of supply for Damasen. The identification of Ramirez as the drug source led to a series of court-authorized wire intercepts of a number of different cellular telephones used by Ramirez to facilitate his illegal activities.[1] Collectively, these wire intercepts, along with physical surveillance, drug seizures, and other methods of investigation, demonstrated that Quintana was supplying Ramirez with large quantities of methamphetamine which Ramirez then distributed in the San Francisco Bay Area and Hawaii.

On November 29, 2005, after intercepting a series of conversations regarding a shipment of methamphetamine to Hawaii, agents conducting surveillance observed Ramirez personally transport two large boxes to a nearby FedEx/Kinkos where he dropped off one of the boxes. On December 2, 2005, United States Magistrate Judge Elizabeth D. Laporte signed a search warrant for the package. The search warrant was executed that same day and resulted in the seizure of approximately 16 pounds of crystal methamphetamine concealed inside four sealed one-gallon cans. Subsequent analysis by the DEA Western Regional Laboratory reflected the exhibit consisted of 6,663 grams actual methamphetamine. The quantity of methamphetamine seized was the equivalent of over 850,000 doses.[2]

On November 29, 2005, United States District Judge Jeffrey S. White signed an

---

[1] On October 18, 2005, United States District Judge Martin J. Jenkins signed an order authorizing the interception of telephone number (650) 826-5219, used by Ramirez and of a Mexican Nextel used by Quintana. On November 16, 2005, United States District Judge Jeffrey S. White signed an order authorizing the continued interception of the wire communications of (650) 826-5219 used by Ramirez, the interception of telephone number (650) 921-3635, used by Ramirez, and the interception of a Mexican Nextel used by Quintana.

[2] Under the United States Sentencing Guidelines, only 1.5 kilograms of pure methamphetamine triggers a Level 38, the maximum under U.S.S.G. § 2D1.1. In this one shipment, there was more than four times the amount of methamphetamine needed to trigger the top level.

DETENTION ORDER 8

order authorizing the interception of telephone number (650) 670-5026, used by co-defendant POHAHAU. Interceptions over the wiretap and physical surveillance demonstrated that Quintana and Ramirez were also a source of supply to codefendant POHAHAU. On December 6, 2005, Jose Luis Ayala, acting under the direction of Quintana, Ramirez, and Jose Antonio Zarate Araiza, delivered approximately 22 pounds of crystal methamphetamine to Sione Tuifua and Natali Cisneros, both of whom were acting under the direction of POHAHAU, at the residence of Tuifua located at 105 Nueva Street, Redwood City, California. Agents subsequently observed Cisneros carrying a brown cardboard box from his vehicle into a post office and turn it over to a clerk for delivery to Hawaii. A federal search was subsequently executed with respect to the package located in Honolulu. This search warrant resulted in the seizure of approximately 22 pounds of crystal methamphetamine concealed inside sealed one-gallon food cans.[3] Subsequent analysis by the DEA Southwestern Regional Laboratory reflected that one package contained 6,915 grams actual methamphetamine (889,999 doses) and the second package contained 2,722 grams actual methamphetamine (349,000 doses).

Interceptions over the wiretaps also demonstrated that co-defendants Araiza and Ayala were involved in transporting drugs and money between Northern California and Southern California for Quintana and Ramirez and led to wire intercepts over a telephone used by Araiza.

On January 3, 2006, United States District Judge Barry Ted Moskowitz signed an order authorizing interceptions over telephone number (619) 827-2699, used by Araiza. On January 18, 2006, California Highway Patrol (CHP) effected a traffic stop of a vehicle driven by Tocayo. As a result, the CHP identified Araiza and determined the vehicle he was driving was subject to tow. Araiza was allowed to leave, and a search of the vehicle prior to it being towed led to the seizure of nearly $1.4 million dollars in US currency

---

[3] In a subsequent search of 103-105 Nueva Street, the residence of Sione Tuifua, agents discovered a machine for sealing gallon cans.

DETENTION ORDER 9

concealed inside luggage found in the vehicle.

On February 28, 2006, United States District Judge Martin J. Jenkins signed an order authorizing the interception of wire communications over two additional telephones used by Ramirez. Wire intercepts and physical surveillance led agents to believe that a delivery of cocaine was to take place. That same day, Oakland Police Department Officers conducted a traffic stop of the vehicle. A subsequent search of the vehicle led to the seizure of approximately 50 kilograms of suspected cocaine concealed inside two large speaker boxes. Ramirez was later intercepted discussing the fifty kilogram shipment with Quintana.

The Court authorized electronic surveillance on the telephone used by POHAHAU resulted in identification of co-defendant Jason Marx as a distributor for POHAHAU. On May 3, 2006, a search of the residence of Jason Marx was conducted. Upon entering, Agents found Marx in the process of flushing methamphetamine down the toilet. Agents recovered three pounds of crystal methamphetamine and two loaded firearms from under Marx' bed.

Although the strength of the evidence is the least important factor for the Court to consider, here the Court notes that the evidence appears strong and reveals that Pohahau is a multi-district, multi-pound/kilogram level distributor of methamphetamine and cocaine. According to the government's proffer, records of the organization seized at the time of Pohahau's arrest reveal that in an eight month period, POHAHAU received 170 pounds of methamphetamine at a cost to him of $1,440,000.00[4].

### III. LEGAL AUTHORITY TO DETAIN THE DEFENDANTS

Under the Bail Reform Act, an authorized judicial officer may order the detention or release of a defendant pending trial. A rebuttable presumption of both dangerousness and risk of flight exists when the defendant is charged with a drug felony that carries a

---

[4] POHAHAU obtained the methamphetamine for approximately $8500 per pound and was able to sell it in Hawaii for $26,000 per pound.

DETENTION ORDER 10

maximum term of imprisonment of ten years or more. 18 U.S.C. §3142 (e). Once the defendant produces some evidence to rebut the presumption, the presumption has been rebutted. United States v. Cook, 880 F. 2d 1158, 1162 (10th Cir. 1989). However, the presumption does not disappear, but rather remains as a factor for consideration in the Court's determination. Id.

The potential sentences in this case far exceed those sufficient to trigger a presumption and place an enormous incentive on the defendants to flee. In the matter before this court, the defendant faces a maximum of life in prison, and a minimum mandatory term of imprisonment of ten years. In the case of defendant POHAHAU, who has a prior drug felony, his exposure is a minimum mandatory twenty years to life.[5] As for the rebuttable presumption of danger, 18 U.S.C. § 3142(f)(1), identifies those types of crimes in which "a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(e). See United States v. Salerno, 481 U.S. 739, 750 (1987) ("The act operates only on individuals who have been arrested for a specific category of extremely serious offenses.... Congress specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest.") (citation omitted); S.Rep. No. 98-225, p. 6-7 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3189; United States v. Koon, 6 F.3d 561, 566 (9th Cir. 1993) (justifying the presumption of dangerousness in 18 U.S.C. § 3142(f)(1) because "there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons").

The judicial officer may detain a defendant if the government proves by a preponderance of the evidence that the defendant poses a risk of flight. United States v.

---

[5] It should be noted that POHAHAU is not a citizen of the United States and retains ties to the nation of his birth, Tonga.

DETENTION ORDER 11

Motamedi, 767 F. 2d 1403, 1407 (9th Cir. 1985), United States v. Gebro, 948 F. 2d 1118, 1121 (9th Cir. 1991). The preponderance of evidence shows a risk of flight where, among other factors, the weight of the evidence is enough to alert the defendants to a "reasonable possibility of conviction." United States v. Townsend, 897 F. 2d 989, 993-94 (9th Cir. 1990). In assessing flight, a court may consider that defendant having no visible means of support, no property who is well known to narcotics officers for some period of time and has ample funds to provide him with a means of absconding is a poor flight risk and a case in which bail is properly denied. Further, in cases with large sums of cash available to the defendant the court may draw the conclusion that the defendant has the means to abscond. A defendant's financial condition and the length of sentence he or she faces are of particular importance in assessing the risk of flight.

The judicial officer may also detain a defendant where the government shows by clear and convincing evidence that no release condition will reasonably assure the safety of the community. Specifically, detention may be ordered where the court finds no condition or combination of conditions could prevent the defendant's continued or future criminal activity. United States v. Salerno, 481 U.S. 739 (1987).

In assessing danger, physical violence is not the only form of danger contemplated by the statute. Danger to the community can be in the form of continued narcotics activity or even encompass pecuniary or economic harm. United States v. Reynolds, 956 F.2d 192 (9th Cir. 1992). Propensity to commit crime generally may constitute a sufficient risk of danger to come within the act. See, United States v. Karmann, 471 F. Supp. 1021, 1022 (C.D. Cal 1979).

Ultimately, the government bears the burden of proving by a preponderance of the evidence that the defendant poses a flight risk, or by clear and convincing evidence that the defendant poses a danger to the community. United States v. Gebro, 948 F. 2d 1118, 1120 (9th Cir. 1991); United States v. Motamedi, 767 F. 23d 1403, 1405 (9th Cir. 1985).

IV. **CONCLUSION**

POHAHAU is a convicted drug felon with a clear and convincing history of violence. The Court finds that there are no conditions or combination of conditions which will guarantee the safety of the community from the danger posed by POHAHAU. THEREFORE, the Court ORDERS that he be detained.

DATED: July 17, 2006

HON. NANDOR J. VADAS
UNITED STATES MAGISTRATE JUDGE

DETENTION ORDER                13